# COURT OF APPEALS.

Isaac M. Milbank, Robert W. Milbank and Jeremiah Milbank agt. Alexander Dennistoun, John Dennistoun, William Wood, William Cross, William C. Mylne and Thomas Sellar.

*Agents* and *factors* are always bound to the exercise of good faith, and the employment of prudence and skill in reference to the property of others committed to them.

Where the plaintiffs, in New York, on consignment of a cargo of flour to their factors in Liverpool, England, expressed generally, in their letter of instructions, that they wished their flour to be held until the operation of the new corn law (then about to be passed in England,) should have produced its results; or (in substance,) to have the benefit of the new law, unqualified by the consequences of the glut in the market which would probably take place immediately after its passage.

*Held,* where it appeared from the evidence that the defendants, (the factors,) after the market had been working for some five weeks under the influence of the law, and taking into consideration the result of the English harvest as a material element in determining when the market had attained the equilibrium which had been temporarily disturbed by the large entries of flour for consumption immediately on the passage of the act, sold the flour of the plaintiffs at the market prices then prevailing, that the defendants were not at the time of the sale restrained by their instructions from selling.

Therefore, it was error in the court below, as there was no question of credibility to be determined by the jury, the evidence not being in any respect contradictory, to submit it to the jury to determine whether there had been such breach of instructions.

Leaving out of view the alleged instructions, there was not sufficient evidence upon which the defendants could be charged with a breach of *duty* in selling the flour at the time and for the price they did.

Appeal from a judgment of the general term of the superior court in the city of New York, affirming the judgment rendered at special term. (For a full statement of the whole facts of the case, see 1 *Bosworth*, 246.)

The plaintiffs are commission merchants in the city of New York, with a branch house in New Orleans. The defendants are commission merchants in Liverpool, with a branch house in New York. The case discloses the following substantial facts: That in the month of June, 1846,

the plaintiffs shipped to the defendants 5,000 barrels of flour by the ship Nicholas Biddle, and 3,000 barrels by the ship Georgiana. That the flour was all of the same quality, and arrived about the same time, and was all consigned to the defendants as factors. That the plaintiffs sent two letters of instructions, one dated June 25, 1846, and the other still more particular and explicit, dated June 27, 1846, which letters were both received by the defendants before the flour arrived. These letters are as follows:

"NEW YORK, *June* 25, 1846.

Messrs. A. DENNISTOUN & Co., *Liverpool :*

Gents : We had this pleasure 30th ult., advising of shipment to your address an invoice of flour per ship ' N. Biddle,' from N. Orleans. We would now inform of having consigned to you five thousand (5,000) barrels flour per ' N. Biddle,' and three thousand barrels flour per ship ' Georgiana,' (3,000) both from New Orleans. Owing to some oversight at N. O. we have not rec'd the entire sets of bills of lading, and have therefore been unable to perfect our arrangements with your house here, but hope to do so in time for the ' Caledonia' mail; when we shall hand you invoices.

You will please make no disposition until we give you our wishes, per ' Caledonia,' unless 22s in bond is obtainable, in which case, if in your judgment deem it our interest to accept that sum, please to do so.

Our R. W. Milbank designs visiting your city soon, and we trust our correspondence may be extended. Owing to the apprehension of exorbitant premium for the ' war risk' being demanded, we have, under the advice of your house here, covered these shipments by insurance in our city co's. The same is subject to an average of five per cent. damage.

Very respectfully,

J. & R. MILBANK & Co."

" Caledonia."        " NEW YORK, *June* 27, 1846.

Messrs. A. DENNISTOUN & Co., *Liverpool :*

Gentlemen : Enclosed you will please find invoices of five thousand barrels 'superfine' flour pr. ship 'Nicholas Biddle,' and three thousand barrels 'superfine' flour, pr. ship 'Georgiana' to your address. The bill lading we have handed to your Messrs. Dennistoun & Co., with whom we have made arrangements to advance us two dollars and seventy-five cents pr. barrel on the shipment pr. 'N. Biddle' and two dollars and twenty-five cents pr. barrel on shipment pr. 'Georgiana' based on sixty days, sterling bills at 8 pr. ct. This flour is from the best Cincinnati mills, and in fine order, having been forwarded directly from flat boats to ships. We are induced to hope for its sharing a better fate than ordinary shipments from N. Orleans, as we trust it may arrive out in sweet condition. When shipping, we had. hoped for a better market than the prospect now justifies. We fear the first introductions for consumption may tend to continue low prices, as they will probably be large immediately on the passage of the new bill. Believing that after the stocks now in bond shall have been reduced by consumption, &c., that an improvement may ensue, we would express our desire that these parcels may be withheld from the market until the operation of the new law shall have produced its results. We hope we may not err in assuming its passage. Though if 22s. in bond is obtainable on arrival, and you think our interest dictates such sale, please so dispose of it ; as we have before advised, the shipments are insured here under direction of your house. Our R. W. Milbank designs visiting your city by steamer 17 July and will confer with you.

Very respectfully, your obedient serv'ts,

J. & R. MILBANK & Co."

Endorsed " Rec'd 12th July."

That the British corn law bill reducing the duties on foreign breadstuffs was then before parliament, and the

flour was shipped, and the instructions were given in view of the immediate passage of the law. That the bill received the royal assent on the 27th of June, 1846, and went into operation three days thereafter. That the flour was insured in New York for $4 per barrel, and alleged to have cost the plaintiffs, delivered in Liverpool, upwards of $5 per barrel, which, as alleged, was known to the defendants on or before its arrival.

That the defendants sold the 5,000 barrels per Nicholas Biddle on the 4th, 5th and 7th of August, and at such sacrifice as to give plaintiffs but $2.17 per barrel. That before they sold the Georgiana flour one of the plaintiffs reached Liverpool, and that shipment was not sold until September, October and November following. That if the Biddle flour, which was of the same precise quality, and which arrived at the same time, had been held as the Georgiana, it would have netted the plaintiffs, computing interest up to the day of trial $14,530.29 more than they received.

The plaintiffs claimed this sum as their damages for the sacrifice of their flour, on the ground that the defendants, being factors of the plaintiffs, had disobeyed their instructions; they did, and had not used reasonable diligence and skill in selling under the circumstances and at the time. On the trial, the jury found that the defendants would have been excusable, had they held the flour till the day of      , and the verdict was rendered for the value of the flour on that day, to wit: for $7,829.62. Upon this verdict the judgment was entered, from which the defendants have appealed. The proofs consisted mostly of correspondence, and of depositions taken by the defendants.

Foster & Thomson and F. B. Cutting, *for appellants.*
Pierrepont & Stanley and Jas. T. Brady, *for respondents.*

Milbank agt. Dennistoun.

DENIO, Judge.   The case turns very much upon what is to be considered the true meaning of the letter of June 27, 1846.   In that letter the plaintiffs' expressed their desire that the cargo of flour in question should be withheld from the market until the operation of the new corn law should have produced its results.   The direct effect of the law was greatly to reduce the duty upon wheat and flour imported into the United Kingdom.   Its operation upon the owners of the flour then lying in bond at the British ports, and of such as should thereafter arrive, would be to give them a more advantageous competition with the holders of domestic flour by the amount of reduction of the duty.   If they sold their flour free of duty, or, in other words, if they paid the duty themselves, they could sell at a smaller nominal price in consequence of the reduction of the duties and yet realize larger profits on the sales.   The price of domestic flour must always be a material element in determining the market of the imported article, as the two classes of produce immediately come into competition in the English markets.   The revenue duties may be looked upon as parcel of the expenses of foreign shippers of flour and are of the same character so far as this question is concerned, as the freight or insurance.   It is for his interest to have them fixed at the lowest rate.   Hence the plaintiffs regarded the corn law for the reduction of the duties as a market advantage in their favor which they were desirous of realizing the benefit of.   But they saw also what was sufficiently obvious, that this advantage might be neutralized at least, if not more than balanced, by the great accumulation of imported flour remaining in bond and awaiting the new parliamentary measure which, in the event of a passage, would be released at the anticipated low duties, and thrown upon the market in competition with their own flour taken out by the Nicholas Biddle, and producing what is termed a glut in the market.   The object of the instructions of the

27th June plainly was to guard against this state of things. The plaintiffs said to the defendants in effect, we desire to have the benefit of the new law, which we trust will pass, but we fear that if our flour is sold when the first introductions for competition take place immediately upon the passage of the bill, we shall lose the advantage. We desire, therefore, that it may be withheld from the market until the operation of the new law shall have produced its results, in other words, we wish to have the benefit of the new law, unqualified by the consequences of the glut · in the market which we foresee will take place immediately after its passage. But there were other circumstances which it was foreseen would enter into the state of the market, the most material of which was the approaching harvest in the United Kingdom, which must always have a material influence upon the price of breadstuffs in the market of that country, as it is well known they have for the same reasons in the markets of countries which export grain. The plaintiffs, therefore, did not direct the defendants to withhold their flour from market for any definite period, which, if they had done, the defendants must have obeyed the direction at their peril, nor did they require that it should be kept out of market until any particular amount of diminution of the stock released from bond should have been realized, but they chose to express their desire in very general terms. They wished their flour to be held until the operation of the new law should have produced its results. This of course cast upon the defendants the duty of determining, under all the circumstances bearing upon the question, when the period referred to should arrive. This would not depend wholly upon the degree to which the old stock of imported flour should have been reduced, but also upon the prospect of the domestic corn. It was, no doubt, implied that the flour was not to be sold until the stock of imported flour existing when the law should pass should have been materially

reduced by consumption; though the .direction is not to that effect in terms, it is recited, as a belief of the plaintiffs that a reduction would cause an improvement in the market, as it obviously would, if not met by counteracting circumstances. We are to determine, therefore, whether, upon the construction which has been given to the letter, the defendants departed from the instructions contained in it by selling flour on the 4th of August, supposing it had all been sold on that day. The act took effect as a law, June 30, and immediately all the flour then in bond was released by the payment of the reduced duties, and that subsequently arriving was entered and the duties at once paid. The holders immediately became free sellers. The demand from this country was large and freely met. These sales were for consumption, not a speculation. They were, therefore, the kind which were referred to in the plaintiffs' instructions. They operated to reduce the stock in bond at the time the act passed; but the evidence does not furnish any means of ascertaining the amount positively of such reduction, or how far it was balanced by fresh importations, though it appears that the quantity on hand continued to be large.

While this state of things was going on, the plaintiffs' letter was received, on the 12th of July, and about a week after, on the 18th, the vessel with the flour arrived. It should be remembered that when the letter was written it was not known in New York that the act had passed. In fact it received the sanction of parliament the same day on which it was written. The letter looked to the passage of the act, and not to the arrival of the flour, as the time when the reduction referred to would commence. So far as the plaintiffs knew, it might not become a law until after the flour should have arrived. Indeed, they were not certain that it would become a law at any time. What they chose to forbid, (if the letter is to be looked upon as peremptory,) was that their flour should not be thrown

upon the market in competition with the mass which would be on sale immediately upon the passage of the act. Now the sale of the first parcel of the flour was made five weeks after that point of time. During all of which interval sales were being constantly made for consumption.

In the opinion of the superior court, at general term, the letter is construed as though the defendants were forbidden to sell until the stock of flour should be reduced, by consumption, after the arrival of the Nicholas Biddle, and it is reasoned that as it was sold soon after that time, it was not withheld from market for any period. The charge, I think, contains the *same* idea as to the construction of the letter. But, upon that construction, the defendants would be obliged to withhold the flour from market, though, when it arrived, the effect of the law had been fully ascertained. The meaning of the letter plainly is, that the plaintiffs did not wish the flour sold during the existence of the glut which it was anticipated would prevail upon the passage of the act. In my opinion, the defendants were not, on the 4th of August, restrained from selling the flour by instructions contained in the plaintiffs' letter. The market had been working for five weeks under the influence of the law. The letter had fixed no period for the continuance of the experiment, and the defendants were left to determine whether the time had arrived when it would be for the plaintiffs' interest to have the property disposed of in the view of all the circumstances of the case. They were, nevertheless, bound to the exercise of good faith, and of the prudence and skill which agents to whom the property of others is entrusted are always obliged to employ, and that was the extent of their obligation. That this view is correct, is apparent from the plaintiffs' own letter of July 31. This was written, it will be remembered, four days before the first parcel of flour was sold. In that communication the plaintiffs say, " we suppose that ere this the crop of wheat has been ascer-

tained as to its probable yield, and the grain and the flour conformed to such result, we therefore ask you to exercise your discretion in effecting sales for us." As this letter was not received until after the last sales of flour, it cannot be used to dispense with any instructions binding upon the defendants when the sales were made; but it affords evidence that the plaintiffs considered that the result of the English harvest was a material element in determining when the market would have attained the equilibrium which it was supposed would be temporarily disturbed by the large entries for consumption immediately upon the passage of the act. This was precisely the view which the defendants appear to have taken of the case when they made the sales. The grain circular of the 3d of August, which the plaintiffs gave in evidence, declared the harvest as progressing favorably and the weather was remarkably fine. Then it was proved affirmatively, on the part of the defendants, that no improvement in the price of flour resulted from the passage of the corn law at any time during the year 1846.

Upon the question whether the defendants had violated their instructions the burden of proof was upon the plaintiffs. All the material testimony bearing upon the subject was produced by them. There was no question of credibility to be determined by the jury, for the evidence was not in any respect contradictory. Thinking, as I do, that there was no evidence tending to show that the defendants sold the plaintiffs' flour prior to the time when the operation of the new corn law had produced its results so far as those results affected the price of flour, I think the judge erred in submitting it to the jury to determine whether there had been such breach of instructions.

Upon the second question, whether, leaving out of view the alleged instructions, there was evidence upon which the defendants could be charged with a breach of duty in selling the flour at the time they did, and for the price

Milbank agt. Dennistoun.

which was obtained, I think there was an equal defect in the evidence. In the first place, it was proved that all the large holders of flour were freely selling at the price which then prevailed, and that the defendants themselves were among the sellers. On the 6th of August they sold 3,000 barrels of their own flour at a less price than that which they obtained for the plaintiffs. It was shown that all the indications were in favor of an abundant domestic harvest, and no immediate improvement in prices was looked for among the dealers in breadstuffs in that market; the prices obtained were the market prices prevailing at the time of the sales, and for some time afterwards; the plaintiffs' flour was a damaged article, and liable to further depreciation if kept on hand. The subsequent extraordinary rise was owing to causes wholly exceptional in their character, which were not so far developed when the sales took place as at all to influence the market; and could not have been anticipated with any degree of sagacity. In looking at the case after the event, we can see that if the defendants had refrained from selling, the adventure would have resulted quite differently as regards the plaintiffs. They would have realized large gains, instead of having suffered a loss, but it would not have been owing in any degree to the corn law.

It seems plain to me that there was not the slightest reason in the evidence to impute blame to the defendants, and that there was nothing for the jury to deliberate upon. If these views prevail with my brethren, the judgment must be reversed and a new trial ordered.

Judgment reversed and new trial ordered.